UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

CASE NO. C19-288 MJP

*IN RE CEDAR SHAKES AND*
*SHINGLES ANTITRUST LITIGATION*

ORDER ON MOTIONS TO DISMISS

This Document Relates to:

ALL CLASS ACTIONS

The above-entitled Court, having received and reviewed:

1. Defendants' Motion to Dismiss Second Amended Class Action Complaints (Dkt. No. 102), Class Plaintiffs' Response to Defendants' Motion to Dismiss Second Amended Class Action Complaints (Dkt. No. 105), and Defendants' Reply on Motion to Dismiss Second Amended Class Action Complaints (Dkt. No.124);

2. Waldun Defendants' Motion to Dismiss (Dkt. No. 98) and Waldun Defendants' Reply in Support of Motion to Dismiss (Dkt. No. 127);

3. Defendant Anbrook Industries, Ltd.'s Motion to Dismiss (Dkt. No. 99), Defendant G&R Cedar's Motion to Dismiss (Dkt. No. 101), and Joint Reply of Defendants G&R

Cedar Ltd. and Anbrook Industries Ltd. in Support of Motion to Dismiss (Dkt. No.

126);

all attached declarations and exhibits, and relevant portions of the record, rules as follows:

IT IS ORDERED that the Waldun Defendants' Motion to Dismiss is GRANTED;

Defendants Waldun Forest Products, Ltd. and Waldun Forest Products Partnership are

DISMISSED for lack of personal jurisdiction.

IT IS FURTHER ORDERED that Defendants' Motion to Dismiss Second Amended

Class Action Complaints (and the ancillary motions to dismiss of the Waldun Defendants, G&R

Cedar Ltd. and Anbrook Industries Ltd. are GRANTED; Plaintiffs' Sherman Act claims against

them are DISMISSED with PREJUDICE.

IT IS FURTHER ORDERED that, based on the dismissal of Plaintiffs' federal claims,

the Court declines, pursuant to 28 U.S.C. § 1367(c)(3), to exercise supplemental jurisdiction over

the remaining state law claims.

## Background

The Court here addresses motions to dismiss in three class action lawsuits which have

been consolidated under the title "In re Cedar Shakes and Shingles Antitrust Litigation." The

three categories of class action plaintiffs are the Direct Purchaser ("DP"), Reseller ("RS") and

End User ("EU") Plaintiffs. The complaints at issue are the Second Amended Complaints

("SACs") of all three classes.[1] They allege (via claims of a price-fixing conspiracy) violations of

the Sherman Act (15 U.S.C. § 1), various state antitrust and consumer protection statutes, and

unjust enrichment against a number of "Manufacturer Defendants" (including movants herein the

---

[1] The complaints are found in the following dockets: Direct Purchaser Plaintiffs' SAC, C19-577MJP, Dkt. No. 53 (hereinafter "DP ¶"); Reseller Indirect Purchaser Plaintiffs' SAC, C19-451MJP, Dkt. No. 74 (hereinafter "RS ¶"); and End User Plaintiffs' SAC, C19-288MJP, Dkt. No. 66 (hereinafter "EU ¶").

Waldun Defendants, Anbrook Industries and G&R Cedar) as well as a trade association known as the Cedar Shake and Shingle Bureau ("CSSB").

Plaintiffs recount multiple anecdotal instances of Defendants pressuring various persons and companies to increase prices – the pressure is variously described as "urging," "exhorting," "admonishing," and "scolding." DP ¶ 9, 200-01, 208, 211, 225-26; EU ¶ 159, 195, 199, 201, 205, 211, 216, 219, 220,226; RS ¶ 240-41, 245, 263, 274, 282. Where Plaintiffs identify the speaker, the author of the pressuring comments was almost exclusively Waldun Defendants' owner Curtis Walker. The complaints allege that non-cooperating companies were punished by expulsion from CSSB. DP ¶ 210, 211; EU ¶ 205, 211; RS ¶ 263-64. Plaintiffs argue in their response that "repeatedly exhorting competitors to keep prices high and punishing competitors who lowered prices… makes no sense in the absence of an agreement to fix prices." Dkt. No. 105, Response at 19.

Plaintiffs assert a "context" for the alleged conspiracy through their claims that the Certi-Label™ certification brand controlled by CSSB accounts for 95% of the cedar shakes and shingles ("CSS") sold in the United States (DP ¶ 158; EU ¶ 181; RS ¶ 160), and further that the "Manufacturer Defendants" (all the individual companies named as Defendants alongside the CSSB organization itself) control the CSSB with a "combined voting power of more than 50%." DP ¶ 141-59 163; EU ¶ 180-89; RS ¶ 142-61,167.

Plaintiffs allege that the Manufacturer Defendants have utilized their majority voting bloc to institute a series of measures within the CSSB (e.g., reducing the number of seats on the Board of Directors and changing quorum requirements) to consolidate their power. DP ¶ 169; EU ¶ 192; RS ¶ 223. Plaintiffs further claim that the enforcement of an "All or Nothing Rule" (which they allege prohibits CSSB members from selling non-Certi-Label™ products; DP ¶ 173-79; RS

¶ 177-81; EU ¶ 186-88) and the convening of "secret" meetings (DP ¶ 171; EU ¶ 187; RS ¶ 175, 179) "plausibly establish that Defendants have the means, motive, and ability to implement, police, and enforce a price-fixing conspiracy."  Response at 21.

Outside of the Certi-Label™ brand itself, "CSSB-97 grading rules" have been incorporated into building codes throughout the U.S. and Canada (DP ¶ 150; EU ¶ 133; RS ¶ 209), solidifying the necessity of remaining within CSSB in order to compete in the CSS market.

Plaintiffs also allege a series of facts intended to establish that the CSS industry has the characteristics of a market "susceptible to collusion."  DP ¶ 244; EU ¶ 223.  Plaintiffs describe those conditions as:

1. A market controlled by a small number of companies; they allege that the Manufacturer Defendants control "over 50% of the Certi-Label™ CSS production."  DP ¶ 189-97, 255; EU ¶ 155, 178-79; RS ¶ 165, 167.

2. Certi-Label™ CSS are standardized products, thus making the price the principal means of competition.  DP ¶ 247-48; EU ¶ 120; RS ¶ 209.

3. Other products cannot be substituted for Certi-Label™ CSS based on a perception that no other similar products are CSSB-97 compliant, resulting in a "relatively inelastic" price for Certi-Label™ CSS.  DP ¶ 150-57, 249-53; EU ¶ 151-53; RS ¶ 211-12.

4. High barriers to entry into the CSS market (primarily, that a company must be a member of CSSB to sell Certi-Label™ CSS).  DP ¶ 269; RS ¶ 239.

5. "[A]bundant opportunities to conspire" – e.g., long-term relationships, geographic proximity, regular CSSB meetings and trade shows.  DP ¶ 166-67, 183-88, 244, 257-63; EU ¶ 157-71; RS ¶ 224-32.

Finally, Plaintiffs include pricing charts which they allege document a history of price increases in the face of stable "primary input cost" (i.e., wood) and demand, as well as stable or increasing inventories, all of which they maintain should have driven prices down in a competitive market.  DP ¶ 232-43; EU ¶ 130, 142, 146-48; RS ¶ 240-48.

In addition to the Plaintiffs' allegations, the Court also notes the following procedural history for this litigation, as it provides some context for the Court's conclusion that further opportunities to amend Plaintiffs' pleadings would be futile:

The issues in this series of lawsuits first came to light a year ago with the filing of S&W Forest Products, Ltd. v. Cedar Shake & Shingle Bureau, et al., C19-202MJP.  The Plaintiff in that matter alleged the basics of the price-fixing conspiracy which is asserted by all the Plaintiff classes here, along with breach of contract allegations claiming it had been wrongfully removed from the CSSB for its refusal to fall in line with dictates of the conspirator-companies.  Id., Dkt. No. 1.

Following the filing of an amended complaint, the Court dismissed S&W's Sherman Act claims in August 2019.  Dkt. No. 116.  At the heart of the Court's rationale for dismissal was Plaintiff's inability to allege sufficient facts to either directly or circumstantially establish the existence of a conspiracy.  Id. at 8.  Following the dismissal of the antitrust portion of the S&W complaint, Plaintiff moved to file a second amended complaint. Dkt. No. 117.  Before the Court could rule on that motion, however, the parties reached a stipulated settlement and the entire lawsuit was dismissed.  Dkt. No. 143.

Shortly after the filing of the S&W complaint, the first of what became a series of class action suits against CSSB and the Manufacturer Defendants began appearing.  Liebo v. CSSB, et al. (C19-228MJP) was filed later in February 2019; followed by Fraser Construction Co., Inc. v.

CSSB, et al. (C19-451MJP) in March 2019; Bradow v. CSSB, et al. (C19-577) in April 2019; and the transfer of a New York case, ZRD Group LLC v. CSSB, et al. (C19-784MJP) in May 2019. Eventually all the class actions were consolidated under a single case number (C19-288MJP) as *In re Cedar Shakes and Shingles Antitrust Litigation*.

All the Plaintiff classes filed a first amended complaint on June 28, 2019. On July 17, 2019, the Court held a status conference with all parties at which issues such as case scheduling, discovery, and motions practice were discussed. The parties were ordered to meet and confer and file a revised case schedule with the Court reflecting the results of the status conference and the meet and confer. Dkt. No. 47. Anticipating that motions practice in the matters would commence with the filing of motions to dismiss in all cases, the Court additionally ordered the Defendants, as part of their meet and confer, to "lay their cards on the table" in terms of the perceived weaknesses in Plaintiffs' complaints that would be the focus of the 12(b)(6) motions.

The parties submitted their Joint Status Report on July 24, 2019. Dkt. No. 48. Over a month later, the Plaintiff classes filed their Second Amended Complaints (*see* fn. 1, *supra*). Defendants followed a month later with the motions to dismiss which are the subject of this order.

**Discussion**

Standard of review

Under FRCP 12(b)(6), the Court may dismiss a complaint for "failure to state a claim upon which relief can be granted." In ruling on a motion to dismiss, the Court must construe the complaint in the light most favorable to the non-moving party. Livid Holdings Ltd. v. Salomon Smith Barney, Inc., 416 F.3d 940, 946 (9th Cir. 2005). The Court must accept all well-pleaded

allegations of material fact as true and draw all reasonable inferences in favor of the plaintiff. Wyler Summit P'ship v. Turner Broad. Sys., 135 F.3d 658, 661 (9th Cir. 1998).

Dismissal is appropriate where a complaint fails to allege "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009). As a result, a complaint must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555. Additionally, in the specific context of complaints alleging conspiracy,

> an allegation of parallel conduct and a bare assertion of conspiracy will not suffice. Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality. Hence, when allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action.
>
> The need at the pleading stage for allegations plausibly suggesting (not merely consistent with) agreement reflects the threshold requirement of Rule 8(a)(2) that the "plain statement" possess enough heft to "sho[w] that the pleader is entitled to relief." A statement of parallel conduct, even conduct consciously undertaken, needs some setting suggesting the agreement necessary to make out a § 1 claim; without that further circumstance pointing toward a meeting of the minds, an account of a defendant's commercial efforts stays in neutral territory. An allegation of parallel conduct is thus much like a naked assertion of conspiracy in a § 1 complaint: it gets the complaint close to stating a claim, but without some further factual enhancement it stops short of the line between possibility and plausibility of "entitle[ment] to relief." Cf. DM Research, Inc. v. College of Am. Pathologists, 170 F.3d 53, 56 (CA1 1999).

Id. at 556-57.

Waldun Defendants – Lack of personal jurisdiction

Defendant Waldun Forest Products Sales ("WS") concedes that personal jurisdiction exists over it by virtue of its sales activity in the U.S. Dkt. No. 98, Motion at 2. The remaining two Waldun Defendants – Waldun Forest Products Ltd. ("WL") and Waldun Forest Product Partnership ("WP") contest the existence of personal jurisdiction over them. The Court agrees that personal jurisdiction does not exist over these two parties.

The jurisdiction test in the Ninth Circuit is well-known: in order to justify the exercise of personal jurisdiction over a defendant, Plaintiffs must establish that

1. The defendant purposefully directed activities within the forum

2. The claim(s) arise out of the forum-related activities

3. The exercise of jurisdiction is reasonable.

Schwarzenegger v. Fred Martin Motor Co., 374 F.3d 797, 802 (9th Cir. 2004). Because this is a Sherman Act case, neither WL or WP contests that the "forum-related" activities test is conducted under a "national contacts" analysis; i.e., activity anywhere within the U.S. suffices to satisfy the "purposeful direction" element.

Plaintiffs point out that the Court has previously found jurisdiction over WL, in the S&W case. S&W Forest Products v. CSSB, et al., C19-202, Dkt. No. 116 at 6-7. But WL did not make the arguments in S&W that it makes here; namely, that the enterprise (a) has no sales or other activity directed to the forum; and (b) is a holding company (which, by legal definition, cannot commit "intentional acts"). In re Packaged Seafood Antitrust Litig., 242 F.Supp.3d 1033, 1158 (S.D. Calif. 2017).

Plaintiffs' complaints contain no allegations that either WL or WP specifically initiated or directed any forum-related activities. Both companies deny any sales in the U.S. Plaintiffs'

allegations include a claim that "the Partnership has represented that its 'customized products were used to restore Philadelphia's Independence Hall'" (Dkt. No. 99, Response at 54; DP ¶ 30; EU ¶ 37; RS ¶ 37) but saying that a company's products were used in a particular project is <u>not</u> equivalent to saying that the company itself sold them into the U.S.

In a similar vein, Plaintiffs point to their allegation that WL permits the registration of warranties for Waldun products at a U.S. address (DP ¶ 30) as proof of "forum-related" activity. But, again, the registration of warranties is <u>not</u> equivalent to sales and is <u>not</u> related to the activity for which Plaintiffs are seeking to hold these Defendants liable.

Lacking any specific allegations regarding forum-related activity on the part of WL or WP, Plaintiffs fall back on the fact that the three companies (WS, WL, and WP) market themselves as "the Waldun Group" as the basis to exercise jurisdiction over all three of them. It is not a convincing argument.

Forum contacts must be "assessed individually," not as a group. <u>Calder v. Jones</u>, 465 U.S. 783, 790 (1984). Parent-subsidiary business relationships alone have long been held insufficient to impute contacts for jurisdictional purposes. <u>Ranza v. Nike, Inc.</u>, 793 F.3d 1059, 1070 (9th Cir. 2015). Only where the proof is sufficient to allege "complete unity of interest" – i.e., <u>alter ego</u> liability – are Plaintiffs permitted to pierce the corporate jurisdictional veil. Plaintiffs have made no allegation and no showing of such a "unity of interest" for these three companies.

Along similar lines, Plaintiffs point out that all three businesses are controlled by the same two people (Kirk Nagy and Curtis Walker) and that one of those individuals (Walker) is most frequently cited as the principal source of the pressure to raise the prices of CSS products;

implying that since the Court cannot tell which company Walker was representing when he applied the pressure, all must answer for Walker's conduct in court. However,

> the Ninth Circuit has not adopted a conspiracy theory of personal jurisdiction, and district courts within the Ninth Circuit have rejected it. *See, e.g.,* <u>Kipperman v. McCone</u>, 422 F.Supp. 860, 873 n. 14 (N.D.Cal.1976) ("[P]ersonal jurisdiction over any non-resident individual must be premised upon forum-related acts personally committed by the individual. Imputed conduct is a connection too tenuous to warrant the exercise of personal jurisdiction.").

<u>Hilsenrath v. Equity Tr. (Jersey) Ltd.</u>, C07-3312SW, 2008 WL 728902, at *4 (N.D. Cal. Mar. 17, 2008), <u>aff'd,</u> 402 Fed. Appx. 300 (9th Cir. 2010).

There is simply not enough alleged here to exert personal jurisdiction over WL or WP. Plaintiffs request permission to conduct "jurisdictional discovery" to ascertain whether WL or WP, either individually or in conjunction with "the Waldun Group," transacted any business related to the subject of this lawsuit in the U.S. Under other circumstances (specifically, if the Court were inclined to allow Plaintiffs to further amend their complaints in the wake of the impending 12(b)(6) dismissal, the Court might be inclined to permit jurisdictional discovery. In light of the Court's decision, discussed *infra*, to dismiss all the lawsuits with prejudice for failure to state claims on which relief may be granted, jurisdictional discovery would be pointless.

<u>Motions to Dismiss (all Defendants)</u>

### ***Sherman Act claim***

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1. Defendants agree that price-fixing agreements between competitors are *per se* illegal. <u>In re Musical Instruments and Equip. Antitrust Litig.</u>, 798 F.3d

1186, 1191 (9th Cir. 2015). The elements of proof require Plaintiffs to sufficiently plead
evidentiary facts which will prove

> (1) a contract, combination or conspiracy among two or more persons or
> distinct business entities; (2) by which the persons or entities intended to
> harm or restrain trade or commerce among the several States, or with
> foreign nations; (3) which actually injures competition.

Kendall v. Visa U.S.A., Inc. 518 F.3d 1042, 1047 (9th Cir. 2008).

Of course, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief'
requires more than labels and conclusions, and a formulaic recitation of the elements of a cause
of action will not do… Factual allegations must be enough to raise a right to relief above the
speculative level." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). The standard on
review of the pleadings is "plausibility," not "possibility;" "plausibility" is established "when the
plaintiff pleads factual content that allows the court to draw the reasonable inference that the
defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662 (2009).

In the antitrust context, Plaintiffs may successfully allege a price-fixing agreement by one
of two means: direct evidence (specific facts) supporting the existence of such an agreement, or
circumstantial allegations (parallel conduct in conjunction with additional "plus" factors). Starr
v. Sony BMG Music Enter., 592 F.2d 314, 325 (2d Cir. 2010).

### *Direct evidence of price-fixing*

Defendants rely heavily on the "heightened pleading" requirement enunciated in both
Twombly (the "[c]omplaint must allege specific facts such as 'a specific time, place, or person
involved in the alleged conspiracies;" Twombly at 565, n. 10) and Kendall (complaint must
"answer the basic questions: who, did what, to whom (or with whom), where, and when?"; 518
F.3d at 1048). They point out that Plaintiffs' allegations fail to assert:

- Other CSSB members who were parties to the price-fixing agreement;

- Which individual at the Defendants' companies entered into the agreement, where, when and how;

- Which CSSB members were expelled for alleged refusing to join the conspiracy;

- Which prices were fixed for which products and in what amounts.

For their part, Plaintiffs attempt to soften the pleading requirements, pointing out that the cases call for allegations "such as" time, place, or person, not necessarily those elements specifically. That may be true, but the allegations must point to an <u>agreement</u> and Plaintiffs' complaints are devoid of any allegations which plausibly suggest that anyone actually conferred, discussed and/or consented to any plan of action to fix the prices of any Certi-Label™ product; the fact there were <u>opportunities</u> to do so is not enough.

The Ninth Circuit in <u>Kendall</u> held unequivocally:

> To state a claim under Section 1 of the Sherman Act, 15 U.S.C. § 1, claimants must plead not just ultimate facts (such as a conspiracy), but evidentiary <u>facts which, if true, will prove</u>: (1) a contract, combination or conspiracy among two or more persons or distinct business entities; (2) by which the persons or entities intended to harm or restrain trade or commerce among the several States, or with foreign nations; (3) which actually injures competition.

<u>Kendall</u>, 518 F.3d at 1047 (9th Cir. 2008)(emphasis supplied). None of the facts upon which Plaintiffs rely to create their "plausible inference" of a price-fixing conspiracy – Walker's pressuring comments, the expulsion of the certain (unnamed) CSSB members, the numerous opportunities these Defendants had to meet, the various bylaw revisions – can be said to constitute facts which, if true, <u>prove</u> the existence of a contract, combination, or agreement to restrain trade (beyond Plaintiffs' conclusory comments that they were all in furtherance of the alleged price-fixing conspiracy). As the <u>Twombly</u> court said, "a conclusory allegation of

agreement at some unidentified point does not supply facts adequate to show illegality." 550 U.S. at 557.

The final nail in the coffin of Plaintiffs' failure to adequately plead a "direct evidence" case of price-fixing is that, despite the numerous allegations regarding Curtis Walker (or at times possibly Brooke Meyer) pressuring other businesses to raise prices or keep prices up and Plaintiffs' conclusory claims that member companies were expelled for failure to "fall in line," there is not a single allegation in any of the complaints that anyone actually raised their prices in response to the alleged activity; i.e., no evidence of any <u>agreement</u>.

### *Circumstantial evidence of price-fixing*

Properly pleading an antitrust price-fixing complaint by means of indirect evidence is a two-part process. There is a threshold requirement of pleading "parallel anticompetitive conduct" or "parallel pricing." <u>Twombly</u> at 553. If Plaintiffs' proof fails at this point, there is no further inquiry. If Plaintiffs succeed in adequately alleging "parallel conduct," they must also allege additional "plus" factors – "economic actions and outcomes that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action." <u>In re Musical Instruments & Equip. Antitrust Litig.</u>, 798 F.3d at 1194.

--- <u>Parallel conduct</u>

Plaintiffs' allegations of parallel conduct consist almost exclusively of a series of charts showing an industry-wide increase in annual pricing year-to-year, increases which are greater than prices for other "soft lumber products" and which have occurred in the face of stable supplies and rising inventory. DP ¶ 233-41; RS ¶ 241-47; EU ¶ 138-46. They argue that there is no reasonable explanation for such behavior except collusive price-fixing.

Defendants attack the data on multiple fronts. The charts track <u>all</u> CSS products, not just the Certi-Label™ products sold by the Manufacturer Defendants. There is no indication on the chart that the prices being tracked are the prices in the <u>U.S.</u> The prices shown are average prices; there is no way to tell from the information provided what specific price was being charged for a specific product by any of the Defendants to this case.

The Court agrees that the pricing data is hardly incontrovertible evidence of parallel conduct of the sort alleged by Plaintiffs in their SACs. As will be seen later, these deficiencies ultimately prove fatal to Plaintiffs' pleadings. But at this initial juncture in the assessment of Plaintiffs' indirect evidence of a conspiracy, the Court finds that their allegation (uncontroverted) that sales of Certi-Label™ CSS account for <u>95%</u> of the product sold in the U.S. (DP ¶ 158; EU ¶ 181; RS ¶ 160) is sufficient to permit the pricing data to plausibly establish the first element of their proof; namely, to infer that these charts contain the sales figures for the U.S., the majority of which represent the products sold by the Manufacturer Defendants, and that it is just as plausible to infer that these increases are the result of parallel anticompetitive pricing as to accept Defendants' alternate explanations.

However (as many courts have point out), parallel pricing can have many explanations, some of them legitimate, which is why Plaintiffs are required to properly plead both parallel conduct <u>and</u> "plus" factors. While emphasizing that Plaintiffs <u>barely</u> cleared this hurdle, the Court will accept the pricing data as adequately establishing the first element of "parallel conduct" – recognizing that this by itself is insufficient for adequately pleading indirect evidence of a price-fixing conspiracy – and move on to the "plus" factors.

--- "Plus" factors

It is at this point that the inadequacy of Plaintiffs' "indirect evidence" makes itself clear. Measuring Plaintiffs' allegations using the Musical Instruments yardstick ("economic actions and outcomes that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action"), they consistently fall short of the mark.

Defendants' following arguments in regard to the "plus" factors plead in the amended complaints go largely unanswered by Plaintiffs:

- *"Opportunities to conspire (meetings, trade shows, golf games)*: the fact of these opportunities alone does not equate to "price-fixing agreements;" i.e., is not "largely consistent with explicitly coordinated action." They are incidental to membership in a trade association, which has been held insufficient to establish even an inference of illegal anticompetitive conduct.

> Plaintiffs allege that Guitar Center advocated for the concerted adoption of anticompetitive MAP policies at NAMM meetings. But mere participation in trade organization meetings where information is exchanged and strategies are advocated does not suggest an illegal agreement. As we recognized in *In re Citric Acid Litigation*:
>
> > Gathering information about pricing and competition in the industry is standard fare for trade associations. If we allowed conspiracy to be inferred from such activities alone, we would have to allow an inference of conspiracy whenever a trade association took almost any action. As the Supreme Court has recognized, however, trade associations often serve legitimate functions, such as providing information to industry members, conducting research to further the goals of the industry, and promoting demand for products and services.

*In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1196 (9th Cir. 2015)(citation omitted). Defendants also point out an *im*plausible aspect of Plaintiffs' reliance on the existence and practices of a trade association: many of the members of the CSSB are direct purchasers and resellers; i.e., exactly the kinds of parties Plaintiffs are claiming have been harmed by the price-fixing conspiracy they allege.

- *Geographic proximity*: Again, the fact of these opportunities alone does not equate to "price-fixing agreements;" i.e., is not "largely consistent with explicitly coordinated action." In an industry which is geographically determined (i.e., most likely to be located near the material from which their product is manufactured), geographic proximity does not reasonably or plausibly infer collusive anticompetitive agreement.

- *"All or Nothing" Rule*: Plaintiffs assert that this internal restriction prohibits any CSSB member from selling a non-Certi-Label™ product and on that basis cite it as a suspect, overly-restrictive and anti-competitive "plus" factor. But Defendants argue (without rebuttal from Plaintiffs) that the "All or Nothing" Rule simply requires CSSB members to <u>manufacture</u> Certi-Label™-compliant products[2]; they can <u>sell</u> any kind of product they want. Bylaws, Art. III § 1(a). If anything, the plausible inference from this rule is that it is *pro*-competitive, incentivizing members to invest in the production of Certi-Label™ CSS, thus promoting the quality and availability of their signature products. Its existence is more consistent with rational market behavior than a price-fixing agreement.

- *Expulsions ("group boycotts")*: Plaintiffs' allegations that these expulsions from CSSB were motivated by a desire to punish companies which did not fall in line with the price-

---

[2] Members are required to "manufacture or process only Products that comply with CSSB' Product quality, inspection, grading, and labeling policies, procedures, rules, regulations and standards." Bylaws, Art. III § 2(a).

fixing conspiracy are highly conclusory. They provide few names, no numbers (a "yet unknown number of these Former CSSB members") and allege no facts (e.g., timing, statements, or other circumstances) regarding the expulsion of any former member that creates a plausible inference that the termination was related to failure to comply with a price-fixing agreement. *See* DP ¶ 98, 209-10; RS ¶ 106, 261-62; EU ¶ 79. The allegations regarding the expulsion of the one company they do mention by name – S&W – this Court has previously determined to be inadequate to plausibly plead a conspiracy. (<u>S&W</u>, Dkt. No. 116 at 9, 11). The expulsion of the other company that Plaintiffs allege they are "aware of" – but do not mention by name – occurred over a decade ago, well outside the class period. There is zero explanation of the manner in which the expulsions were "pre-textual" and no explanation of how the non-subscribers to the alleged conspiracy were induced or coerced to go along with the terminations.

Plaintiffs contest Defendants' arguments re: "plus" factors in two areas: price increases and market structure. Plaintiffs' argument concerning the price increase allegations has merit in this regard: Defendants' counter-explanation (other factors – taxes, labor costs, demand etc. – could account for the increases) is no more plausible than Plaintiffs', and "Plaintiff's complaint may be dismissed only when defendant's plausible alternative explanation is so convincing that plaintiff's explanation is *implausible*;" <u>Starr</u>, 652 F.3d at 1216-17 (emphasis in original.) In this case, it is not "implausibility" that mitigates against Plaintiffs – their allegations regarding price increases remain insufficient to qualify as the "plus" factor that suffices to plead a price-fixing conspiracy and insulates their complaint from a 12(b)(6) motion because their price data is not "largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action."

In the first place, it is the <u>only</u> allegation Plaintiffs make which even comes close to qualifying as a "plus" factor, while the case law is clear in its requirement of <u>multiple</u> "plus" factors to support evidence of parallel conduct before the pleadings can be deemed adequate. The Ninth Circuit in <u>Musical Instruments</u> described the "plus factors" as "economic action<u>s</u> and outcome<u>s</u> that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action." 798 F.3d at 1194 (emphasis supplied). Because the court is being required to <u>infer</u> an intentional cou<u>r</u>se of conduct, it takes a number of different facto<u>r</u>s to build a sufficiently strong network of inferences.

Second, it is at this point that the over-generality and non-specificity of their pricing data begins to weigh more heavily against Plaintiffs. As the Ninth Circuit said in <u>Musical Instruments</u>:

> First, plaintiffs do not allege that the average retail price of guitars and amplifiers manufactured *by defendants* rose during the class period. They allege an increase in the average retail price of *all* guitars and guitar amplifiers sold, including products outside the relevant product market, like low-cost imports. The same can be said of the alleged drop in sales.

<u>Id.</u> at 1197 (emphasis in original). Nor is it simply the failure to produce any evidence specifically linking the named defendants to the increase in prices. The <u>Musical Instruments</u> court went on to say:

> But even if plaintiffs had alleged that retail prices of defendants' guitars and amplifiers rose in tandem as sales dropped, such a price increase is no more suggestive of collusion than it is of any other potential cause. Plaintiffs do not allege any facts connecting the purported price increase to an illegal agreement among competitors. And without such a connection, there is simply no basis from which we can infer an agreement. In this regard, parallel price increases, without more, are no different from other forms of parallel conduct. They are "merely consistent with a defendant's liability" but "stop[] short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 668 (quoting *Twombly*, 550 U.S. at 557) (internal quotation marks omitted).

Id. Plaintiffs here are in a fatally similar situation. The "plus" factors definition really raises the bar for what Plaintiffs must allege: "economic actions and outcomes that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action." Generic price increase data, without more, does not suffice to meet this standard.

The last arrow in Plaintiffs' pleading quiver are their allegations concerning the structure of the CSS market. DP ¶ 244-49; RS ¶ 201; EU ¶ 17. They assert that the relatively restricted number of major manufacturers, the fact that there really is no substitute for Certi-Label™ products, that the market is vertically integrated, demand is inelastic, and that the major players are all personally acquainted supports an inference that the market is conducive to collusion, which in turn supports an "inference of plausibility" that their antitrust allegations are true. In re Packaged Ice Antitrust Litigation, 723 F.Supp.2d 987, 1014 (E.D. Mich. 2010). There are several problems with Plaintiffs attempt to rely on this factor.

The market that Plaintiffs describe as "conducive to collusion" is also nothing more than an "oligopoly" (a market where there are few sellers). Such a market may find itself raising prices *en masse* in ways that are not illegal.

> Tacit collusion, sometimes called oligopolistic price coordination or conscious parallelism, describes the process, not in itself unlawful, by which firms in a concentrated market might in effect share monopoly power, setting their prices at a profit-maximizing, supracompetitive level by recognizing their shared economic interests and their interdependence with respect to price and output decisions. See 2 Areeda & Turner P404; Scherer & Ross 199-208.

Brooke Grp. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 227 (1993). The lesson of Twombly and its predecessors is clear: industry structure alone cannot get the complaint across the finish line.

> If the complaint's allegations must render it more than merely possible that the defendants entered into an illegal agreement, it cannot be the case that allegations that a market is oligopolistic and a product is homogeneous are sufficient to survive a motion to dismiss. If that were so, an antitrust complaint targeting any industry with those features would survive a motion to dismiss regardless of whether there were any additional facts suggesting an agreement. Hence, while market structure can provide some evidence of an unlawful agreement, it (even combined with parallel conduct) cannot sustain plaintiffs' complaint all on its own.

Wash. Cty. Health Care Auth., Inc. v. Baxter Int'l Inc., 328 F. Supp. 3d 824, 841 (N.D. Ill. 2018).

Plaintiffs make a passing reference, "on information and belief," to the existence of a Department of Justice ("DOJ") investigation of the industry. DP ¶ 13; RS ¶ 13; EU ¶ 15. This allegation does nothing to advance their complaints toward sufficiency. First of all, the allegation merely references an investigation of "the CSS industry" with no specific mention of CSSB or any of the Manufacturer Defendants. Second of all, even if they were specifically named, the Manufacturer Defendants are certainly entitled to the same "presumption of innocence" accorded any accused person. Thirdly, the case which Plaintiffs cite in support of their position that it is permissible to consider the fact of a government investigation in evaluating the sufficiency of antitrust allegations (In re Packaged Seafood, 242 F.Supp.3d 1033 (S.D. Calif. 2017)) is distinguishable: in that matter, a grand jury had been empaneled, a criminal complaint filed, subpoenas issued, and DOJ had issued a press release reflecting their concerns. None of those are true here.

On the issue of the sufficiency of Plaintiffs' pleadings to adequately allege a circumstantial price-fixing conspiracy case, it is the finding of this Court that, while their "parallel conduct" allegations do not disqualify them, they have not succeeded in adequately

alleging the "plus" factors required to convert indirect evidence into a satisfactory antitrust complaint.

Plaintiffs have requested that, should the Court be inclined to grant Defendants' motion, they be granted leave to amend their complaints. The Court understands that "dismissal without prejudice and without leave to amend is not appropriate unless it is clear on de novo review that the complaint could not be saved by amendment." Eminence Capital LLC v. Aspeon Inc., 316 F.3d 1048, 1052 (9th Cir. 2003). Plaintiffs argue that, even though Defendants have made a proffer of the bases for their motions to dismiss in advance of the filing of the SACs, they have not had the advantage of guidance from this Court on any deficiencies in their complaint and thus should be permitted an opportunity to amend in light of this ruling.

The Court is convinced, upon de novo review, that further amendment of these complaints would be futile. Even with foreknowledge of the Court's ruling on S&W's complaint and having the advantage of knowing exactly where Defendants were going to attack their pleadings, Plaintiffs have been unable to muster any more than the most tenuous of allegations in their attempt to establish a conspiracy on the part of these Defendants. The deficiencies in their pleadings are not legal, they are factual, and Plaintiffs have done nothing to convince this Court that somehow there are more facts at their disposal which might somehow transform their conclusory pleadings into a legally sufficient statement of a claim. While the Court might be inclined, under other circumstances, to grant additional discovery to Plaintiffs for jurisdictional purposes, it will not extend the same privilege for purposes of establishing the facts necessary to properly assert a conspiracy. It is this Court's considered opinion that Plaintiffs have mustered every fact at their disposal to establish their claim, that those facts are inadequate, and that

further amendment will not cure that defect.  On that basis, the Court will grant Defendants'

motion of dismissal of the Sherman Act claims with prejudice.

### *State law claims*

Both the RS and EU SACs contain lengthy sections detailing class claims under state

antitrust and consumer protection laws.  RS ¶ 318-742, EU ¶ 263-683.  Additionally, the RS and

EU SACs append a claim for unjust enrichment on behalf of the class members of a number of

states.  RS ¶ 743-45, EU ¶ 684-86.

The Court exercises authority over state law claims by means of supplemental

jurisdiction, a discretionary application of judicial power arising in multi-claim cases where

original jurisdiction exists over at least one of the claims.  A federal statute outlines the

circumstances under which the Court may defer from such an application:

> The district courts may decline to exercise supplemental jurisdiction over
> a claim under subsection (a) if—
>> **(1)** the claim raises a novel or complex issue of State law,
>> **(2)** the claim substantially predominates over the claim or claims
> over which the district court has original jurisdiction,
>> **(3)** the district court has dismissed all claims over which it has
> original jurisdiction, or
>> **(4)** in exceptional circumstances, there are other compelling
> reasons for declining jurisdiction.

28 USCS § 1367(c).  As a result of the ruling on Plaintiffs' Sherman Act claims, the Court

intends to exercise its discretion to decline to exercise supplemental jurisdiction over the

remaining state law claims, as § 1367(c)(3) clearly permits.  In so doing, the Court declines to

reach the parties' arguments on whether those claims are subject to dismissal under FRCP

12(b)(6).

# Conclusion

Plaintiffs' SACs fail to adequately claim state a Sherman Act price-fixing conspiracy claim, by means of either direct or indirect evidence, for which relief may be granted. The Court finds that further amendment would not remedy the deficiencies in Plaintiffs' pleadings, and on that basis orders dismissal with prejudice pursuant to FRCP 12(b)(6).

The Court further declines, pursuant to 28 USC § 1367(c)(3), to exercise supplemental jurisdiction over Plaintiffs' remaining state law claims.


The clerk is ordered to provide copies of this order to all counsel.

Dated February 20, 2020.

Marsha J. Pechman
United States Senior District Judge